2003 WY 92

**Jeanne K. LEE, Appellant (Defendant),**

v.

**LPP MORTGAGE LTD.,**
**Appellee (Plaintiff).**

No. 02–25.

Supreme Court of Wyoming.

Aug. 12, 2003.

Rehearing Denied Sept. 3, 2003.

**156**

John I. Henley of Vlastos, Henley & Drell, P.C., Casper, WY, Representing Appellant. Argument by Mr. Henley.

Dale W. Cottam and Kathleen C. Yarger of Hirst & Applegate, P.C., Cheyenne, WY, Representing Appellee. Argument by Mr. Cottam.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

LEHMAN, Justice.

[¶ 1] Jeanne K. Lee (Lee) appeals the summary judgment granted to LPP Mortgage Ltd. (LPP). In 1995, Lee signed a personal guaranty for a Small Business Administration (SBA) loan taken out by her son and daughter-in-law. The SBA assigned the loan to LPP, and, in 1998, Lee's son and daughter-in-law defaulted on the loan. The district court concluded that, under the terms of the guaranty, Lee was required to pay the loan. We affirm.

### ISSUES

[¶ 2] The issues presented on appeal are:

1. Whether the guaranty was obtained by illegality, misrepresentation, fraud, or mutual mistake.
2. Whether there are genuine issues of material fact as to whether the underlying debt was discharged.
3. Whether LPP failed affirmatively to show by admissible evidence the absence of any issues of material fact and that it is entitled to judgment as a matter of law.

### FACTS

[¶ 3] In September 1995, Lee guaranteed an SBA loan for her son and his wife, Johnnie D. (Doug) and Shirley Lee, so that they could purchase a car wash in Lander. Doug and Shirley initially approached Key Bank of Lander about obtaining a loan, and the bank informed the couple that they might qualify for an SBA loan. On March 24, 1995, Doug and Shirley authorized financial services with Frontier Certified Development Company (Frontier CDC) to act as their agent in submitting financial data and information to the SBA to obtain a loan under the SBA 504 program. Frontier CDC is a development company authorized by the SBA to process SBA loan applications and to package SBA loans for resale once they are finalized.

[¶ 4] Frontier CDC and the SBA agreed to approve Doug and Shirley's loan on the condition that Lee and her husband (now deceased) guarantee the loan. The total purchase price was $380,000.00, with Key Bank financing $190,000.00, Frontier CDC/SBA financing $152,000.00,[1] and the borrowers investing $38,000.00. Lee borrowed the $38,000.00 from Key Bank in Lander and loaned it to Doug for the equity injection. The loan application listed the equity injection as a gift from Doug's parents. The annual debt service for the Key Bank and Frontier CDC/SBA loans amounted to $40,932.00.

[¶ 5] By October 1998, Doug and Shirley had defaulted on the loans. After Doug and Shirley defaulted, they each signed a deed in lieu of foreclosure in favor of Community First National Bank (Key Bank's successor). However, Community First would not record the deeds unless Frontier CDC agreed to release its second mortgage. Frontier CDC agreed to release the second mortgage provided Lee consented as the guarantor. Lee then signed a Lender Agreement that provided for the recording of the deeds and release of Frontier CDC's mortgage. Community First then sold the car wash, receiving $23,119.00 less than its first mortgage amount. No proceeds were available to be applied to Frontier CDC's second mortgage.

[¶ 6] On February 22, 2001, Lee was informed that under the terms of the guaranty, payment for the deficiency was due in full. Frontier CDC, the holder of the promissory

---

1. Lee's Guaranty was for $159,000.00 because administrative costs amounted to $7,000.00.

note, mortgage, and guaranty assigned its rights to LPP on March 12, 2001, and LPP filed a complaint on March 26, 2001, seeking judgment against Lee for the amount of the loan plus interest, costs of suit, and attorney fees. Each party made motion for summary judgment. The district court entered its Order Granting Plaintiff's Motion for Summary Judgment and Denying Defendant's Motion for Summary Judgment on December 13, 2001. Judgment was entered against Lee in the amount of $178,631.62, plus attorney fees and costs. This appeal followed.

### STANDARD OF REVIEW

[¶ 7] The district court resolved this case by a grant and a denial of cross motions for summary judgment. A denial of a motion for summary judgment is an interlocutory order and is generally not subject to appeal. *Wolter v. Equitable Resources Energy Co., Western Region,* 979 P.2d 948, 953 (Wyo.1999). This court has, however, recognized an exception to this rule when the district court grants one party's motion for summary judgment, denies the opposing party's motion for summary judgment, and the district court's decision completely resolves the case. In this type of situation, both the grant and the denial of the motions for summary judgment are appealable. *Lieberman v. Wyoming.com LLC,* 11 P.3d 353, 356 (Wyo.2000).

[¶ 8] Rulings on summary judgment motions are governed by language found in W.R.C.P.56(c):

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Our standard for the appellate review of a summary judgment was reiterated in *Rino v. Mead,* 2002 WY 144, ¶ 12, 55 P.3d 13, ¶ 12 (Wyo.2002) (quoting *Hasvold v. Park County Sch. Dist. No. 6,* 2002 WY 65, ¶ 11, 45 P.3d 635, ¶ 11 (Wyo.2002)):

> Summary judgment is proper only when there are no genuine issues of material fact and the prevailing party is entitled to judgment as a matter of law.... We review a summary judgment in the same light as the district court, using the same materials and following the same standards. "We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences which may fairly be drawn from the record." ... Summary judgment serves the purpose of eliminating formal trials where only questions of law are involved.... We review a grant of summary judgment by deciding a question of law de novo and afford no deference to the district court's ruling on that question....
>
> ... A material fact is any fact that, if proved, would have the effect of establishing or refuting an essential element of a claim or defense asserted by a party.

### DISCUSSION

#### Fraud, Mistake, Misrepresentation, Illegality

[¶ 9] We begin our discussion by recognizing that federal common law governs the rights and obligations of the parties when disputes arise from SBA loan agreements. *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.E.2d 711 (1979). However, we also recognize *Kimbell Foods* established that as long as a national rule is not needed to protect Federal interests, courts may look to and adopt state law in fashioning the appropriate governing law. *Id.* at 728–730, 99 S.Ct at 1458–59. Following *Kimbell Foods,* it appears clear that as long as state law does not hinder the administration of the SBA loan program, courts apply state law. *United States v. Agri Serv., Inc.,* 81 F.3d 1002, 1005 (10th Cir.1996) ("absent federal statutes to the contrary, rights arising under SBA program are determined by state law." (citing *Kimbell Foods,* 440 U.S. at 739–740, 99 S.Ct. at 1464–65)). Because neither party has directed us to differing federal common law and, more importantly, because the application of state law to the facts of this case presents no foreseeable hindrance to the SBA loan pro-

gram, we will apply state law just as federal courts often have when presented with disputes arising from SBA loan agreements. *See United States v. New Mexico Landscaping, Inc.,* 785 F.2d 843 (10th Cir.1986); *United States v. Kelley,* 890 F.2d 220 (10th Cir. 1989); *United States v. Stump Home Specialties Mfg., Inc.,* 905 F.2d 1117 (7th Cir. 1990).

[¶ 10] Lee first argues that the guaranty she executed was obtained by fraud, mistake, misrepresentation, or illegality and is therefore void. Lee alleges she felt pressured to make the guaranty and did not want to sign it, but did so because she and her husband were told that Doug and Shirley would not get the SBA loan unless they guaranteed it. Lee argues she and her husband were not advised that the business would not produce a sufficient cash flow or that the SBA was violating its own regulations. In addition, Lee contends Key Bank represented to her and her husband that the car wash was a good investment for Doug, and that Doug and Shirley's balance sheet was altered by Frontier CDC/SBA to reflect that their equity was nearly $76,000.00 rather than the original $40,761.00 reported by the couple. Lee claims documents were repeatedly modified, a loan was characterized as a gift, and misrepresentations were made so that Doug and Shirley could falsely qualify under SBA regulations.

[¶ 11] Under our standard of review, we are required to view the record from the perspective most favorable to the party opposing the motion for summary judgment. However, this review is limited by the substantive law that actions sounding in fraud must be pled with particularity and proved by clear and convincing evidence. *Bender v. Phillips,* 8 P.3d 1074, 1078 (Wyo. 2000). W.R.C.P. 9(b) requires: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." This requires reference to matters such as the time, place, and contents of false representations, the identity of the person making the representation, and what he obtained thereby. *Johnson v. Aetna Cas. & Sur. Co. of Hartford, Conn.,* 608 P.2d 1299, 1302–03 (Wyo.1980).

[¶ 12] When determining if a genuine issue of material fact exists regarding a claim of fraud, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability. In ruling on a motion for summary judgment, "the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). "[T]here is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find [fraud] by clear and convincing evidence." *Id.See also Richardson v. Hardin,* 5 P.3d 793, 797 (Wyo.2000).

[¶ 13] In her memorandum supporting her motion for summary judgment and opposing LPP's motion for summary judgment, Lee alleged a federal regulation specifically prohibited the SBA from obtaining a personal guaranty from those with less than five percent equity ownership in the collateral. That regulation states:

(a) *Personal guarantees.* Holders of at least 20 percent ownership interest generally must guarantee the loan. SBA, in its discretion, consulting with the Participating Lender, may require other appropriate individuals to guarantee the loan as well, except SBA will not require personal guarantees from those owning less than 5% ownership.

13 C.F.R. § 120.160(a). However, 13 C.F.R. § 120.160(a) did not take effect until March 1, 1996. Because the regulation did not apply when Lee signed the guarantee in 1995, there can be no fraud based on a failure to abide by the regulation.

[¶ 14] Lee next alleged that there was mutual mistake because neither she nor the SBA knew of 13 C.F.R. § 120.160(a). A mutual mistake is one that is reciprocal and common to both parties in which each party is under the same misconception as to the terms of the written instrument. *Patel v. Harless,* 926 P.2d 963, 966 (Wyo.1996). Like fraud, mutual mistake must be shown by clear and convincing evidence. *Id.* at 967. Again, because 13 C.F.R.

§ 120.160(a) was not in effect when Lee signed the guaranty, there could be no mutual mistake by the parties as to its provisions or application.

[¶ 15] We conclude that there are no genuine issues of material fact with regard to fraud or mistake. Lee failed to set forth specific facts sufficient for a fact finder to find either cause of action under the applicable clear and convincing evidence standard. The same is true of the misrepresentation and illegality claims, inasmuch as they are both premised on the same federal regulation.[2]

[¶ 16] We note that Lee recognized that 13 C.F.R § 120.160(a) did not apply and, one day prior to the hearing on summary judgment, filed a Notice of Additional Authority in Support of Defendant's Motion for Summary Judgment and Opposing the Plaintiff's Motion for Summary Judgment. In her Notice of Additional Authority, Lee recited two portions of the 1995 C.F.R. and asserted that the guaranty was illegal under these sections. Neither the regulations cited nor the record support Lee's assertions. A plain reading of 120.103–2(c),[3] cited by Lee, shows that regulation did not restrict the SBA's ability to obtain a guaranty from Lee. Absent further argument or specific fact, Lee's conclusory statements regarding this regulation are not sufficient to defeat summary judgment.

[¶ 17] Lee also cited to 13 C.F.R. § 120.103–2(a) (1995) which provided: "no Financial Assistance shall be extended unless there is reasonable assurance that the loan can be paid from the earnings of the business." Having been presented with a motion for summary judgment supported by affidavits, Lee was required to set forth specific facts showing that there was a genuine issue of material fact regarding whether there was a reasonable assurance that the loan could be paid from the earnings of the business. *See* W.R.C.P 56(e); *Hunter v. Farmers Ins. Group*, 554 P.2d 1239, 1242 (Wyo.1976). Lee provided no such facts in her Notice of Additional Authority or her original affidavit. Our review of the record indicates only that the loan could be repaid from the earnings of the business. Therefore, Lee's assertions on this regulation are likewise insufficient to defeat summary judgment.

[¶ 18] Lee makes additional arguments that Frontier CDC/SBA and its agents hid basic financial facts from her and that they manipulated the application documents to make it appear that Doug and Shirley were eligible for the loan. She claims she was not aware, until after discovery in the instant case, that the cash flow projections prepared by Frontier CDC revealed that the business income would actually pay only the loan amounts,[4] leaving Doug and Shirley with less than half of their accustomed income.[5] Lee claims that Frontier CDC/SBA and its agents owed her a duty to disclose, and their nondisclosure breached that duty. Lee essentially makes an argument for liability for nondisclosure pursuant to Restatement, Second, Torts § 551 (1977):

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had

---

2. Another alleged misrepresentation, that the car wash was a good investment, allegedly was made by a Key Bank employee, rather than by a Frontier CDC or SBA employee, so it is not relevant to this analysis.

3. The portion of 13 C.F.R. § 120.103–2(c) (1995) cited by Lee provides "Proprietors, partners, officers, directors, and owners of 20 percent or more of the business shall generally be required to guarantee payment of the loan and, in SBA's discretion, to pledge personal assets to secure the guarantee. Inadequate collateral will not normally be used as the sole reason for decline unless the applicant refuses to pledge whatever worthwhile collateral is available."

4. Net profit for the car wash for the years 1992 through 1994 amounted to $23,653.00, $26,950.00, and $47,547.00 respectively. Projected net profit for 1995 amounted to $52,300.00.

5. In order to obtain the loan, Doug was required to quit his job, which paid over $35,000.00 annually, and to cash $26,000.00 in Unocal stock from his employment with Unocal to be used as working capital for first year operations. Shirley worked at Safeway, making $21,600.00 annually, and continued working there after the purchase of the car wash.

represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

[¶ 19] This court has not expressly adopted a cause of action for nondisclosure pursuant to Restatement, Second, Torts § 551.[6] In the previous cases in which we were asked to adopt § 551 we declined to do so, concluding that even if we did adopt the restatement, the party's claim would still fail. *Richey v. Patrick*, 904 P.2d 798, 802 (Wyo. 1995); *Hulse v. First American Title Co.*, 2001 WY 95, ¶ 48, 33 P.3d 122, ¶ 48 (Wyo. 2001). In taking such action we said, "[b]efore nondisclosure or fraudulent concealment can be considered, [the plaintiff] must show that [the defendant] had a duty to disclose

the information." *Hulse*, ¶ 48 (quoting *Sundown, Inc. v. Pearson Real Estate Co., Inc.*, 8 P.3d 324, 331 (Wyo.2000)).

[¶ 20] Whether a duty exists is a question of law for the court to decide. *John Q. Hammons Inc. v. Poletis*, 954 P.2d 1353, 1356 (Wyo.1998). The existence of a duty is "to be determined by reference to the body of statutes, rules, principles and precedents which make up the law; and it must be determined only by the court." W. Page Keeton, *Prosser & Keeton on the Law of Torts* § 37 (5th ed.1984). Once it is determined that a duty exists as a matter of law, then any claimed breach of that duty presents a question of fact to be resolved by the trier of fact. *John Q. Hammons Inc.*, 954 P.2d at 1356.

[¶ 21] In making her argument, Lee summarizes § 551 and then asserts that the SBA and its agents represented that this was going to be a good investment and it knew that she was relying on it for analysis. Lee appears to be relying upon Restatement, Second, Torts § 551(2)(a) and (e) to show that Frontier CDC/SBA had a duty to disclose. We find that the requirements of neither of these subsections are met. For a duty of disclosure to arise under subsection (a), a "fiduciary or other similar relation of trust and confidence" must exist between the parties. Two basic types of fiduciary relationships exist. The first type is based on formal legal relationships, such as trustee-beneficiary, partnership, attorney-client, and principal-agency relationships. *Martinez v. Associates Financial Services Co.*, 891 P.2d 785, 785 (Wyo.1995). The second type is an informal fiduciary relationship, which is implied in law due to the factual situation surrounding the involved transaction, and the relationship of the parties to each other and to the transaction. *Id.* This second type of relationship is often called a confidential relationship and would be considered a "similar relation of trust and confidence." *Associated Indemnity Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex.1998).

---

**6.** Lee provides us with no argument or citation to federal case law adopting this cause of action. However, even if she had, the result would be the same because we would still be unable to find the existence of a duty to disclose.

[¶ 22]  We have never before held that the first type of fiduciary duty exists between a creditor and a guarantor, and Lee cites us to no authority for such a proposition.  Restatement, Second, Torts § 551 cmt. f states: "certain types of contracts, such as those of suretyship or guaranty, . . . are recognized as creating in themselves a confidential relation and hence as requiring the utmost good faith and full and fair disclosure of all material facts."  The comment however sheds no light on the parties to this confidential relationship.  Many jurisdictions hold that no such relationship exists between the creditor and the guarantor.  *See Warner v. Clementson,* 254 Va. 356, 492 S.E.2d 655, 657 (1997) (citing *Manufacturers Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 318 (2d Cir.1993); *Village on Canon v. Bankers Trust Co.,* 920 F.Supp. 520, 532 (S.D.N.Y.1996); *Farmer City State Bank v. Guingrich,* 139 Ill.App.3d 416, 94 Ill.Dec. 1, 487 N.E.2d 758, 763 (1985); *Bank Leumi Trust Co. v. Block 3102 Corp.,* 180 A.D.2d 588, 580 N.Y.S.2d 299, 301 (1992); *Miller v. U.S. Bank of Washington,* 72 Wash. App. 416, 865 P.2d 536, 543 (1994)); *Schrager v. North Cmty. Bank,* 328 Ill.App.3d 696, 262 Ill.Dec. 916, 767 N.E.2d 376, 385 (2002).

[¶ 23]  Looking for additional guidance on the subject, we find that a creditor "is not required to search for the surety and inform him of facts affecting the risk, or warn him of the danger of the step he is about to take."  74 Am.Jur.2d, *Suretyship* § 108 (2001).  "[I]t is not fraudulent for a creditor not to advise the guarantor of the guarantor's legal obligations, the financial condition of the principal debtor, or the value of the debtor's collateral."  38 Am.Jur.2d, *Guaranty* § 54 (1999) (footnotes omitted).  Certainly a person who is contemplating becoming a guarantor for the loan of another is entitled to perfect good faith and full disclosure just as the comment states.  However, we also consider the following explanation helpful:

It is well settled that a person proposing to become surety [7] for the conduct or contracts of another has a right to be treated with perfect good faith.  The law does not as a rule, however, require that the party taking the surety shall seek out the surety and explain to him the nature and extent of the obligation;  nor does it hold him responsible for fraudulent misrepresentations made to the surety by the principal, or by a third party, unless such misrepresentations are made with his knowledge or consent.  See *Hamilton v. Wilson,* 11 Clark & Fin. 109; *Atlas Bank v. Brownell,* 9 R.I. 168, 11 Am. Rep. 231; *Griffith v. Reynolds,* [45 Va. 46,] 4 Grat. 46, 49, 50; *Magee v. Manhattan L. Ins. Co.,* 92 U.S. 93, 23 L.Ed. 699; *Warren v. Branch,* 15 W.Va. 21; Brandt on Suretyship, § 447; Bayless on Sureties, 293; Kerr on Fraud and Mistake, 122, 123; 1 Chitty on Contracts, pp. 772, 773.

. . .

In 1 Chitty on Contracts (11th Am. Ed.), pp. 772, 773, it is said that "although a surety is not of necessity entitled to receive, without inquiry, from a party to whom he is about to bind himself, a full disclosure of all dealings between the principal and that party, still if any material part of the transaction is, with the knowledge of the creditor, misrepresented to the surety, or if the creditor fraudulently conceal from the surety any circumstance within his knowledge which it is material for the surety to know, although such concealment be not with a view to any advantage to himself, the guaranty will be void."  *Atlantic Trust & Deposit Co. v. Union Trust & Title Corp.,* 110 Va. 286, 67 S.E. 182, 184–85 (1909).  The discussion above indicates that it is the debtor that has the duty to assure that the guarantor has a full and fair disclosure of all material facts.  The creditor certainly owes the normal contractual duty of continuous good faith and fair dealing but has no general obligation to seek out the guarantor to assure that he has been clearly informed of the risks associated with the transaction.  The creditor's duty to the guarantor is to refrain from misrepresentation and fraudulent concealment and to correct

---

7.  While there are some slight differences between a suretyship and a guaranty, the distinctions are not significant enough to warrant discussion here.  Furthermore, the principles of law discussed here relate to both relationships.  *See* 38A C.J.S. *Guaranty* §§ 10–12 (1996).

such misrepresentations made with his knowledge and consent, and the creditor cannot actively conceal information. The law of contract, misrepresentation, and fraud adequately protect a guarantor against a breach of this type of duty. We therefore conclude that a fiduciary relationship does not exist between a creditor and a guarantor as a matter of law.

[¶ 24] Whether the second type of fiduciary relationship, i.e., a confidential relationship or other similar duty of trust and confidence, exists must be established from the factual situations surrounding the transaction. *Martinez*, 891 P.2d at 789. Although a confidential relationship is certainly broader in scope than the first type of fiduciary relationship, the same general principles apply to its creation.[8] We have said that fiduciary relationships are extraordinary and not easily created. *Id.* (citing *Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 567 (Tex.App.1989)). Because fiduciary relationships carry significant legal consequences, they cannot be the product of wishful thinking. *Id.* (citing *State Farm Mut. Auto. Ins. Co. v. Shrader*, 882 P.2d 813, 832–33 (Wyo. 1994)).

[¶ 25] Lee seems to assert that the bank knew she was relying on it for information, and this creates the second type of fiduciary relationship, the confidential relationship. However, we have said: "Fiduciary duty is not created by a unilateral decision to repose trust and confidence; it derives from the conduct or undertaking of the purported fiduciary." *Martinez*, 891 P.2d at 790 (quoting *Farmers Ins. Co. v. McCarthy*, 871 S.W.2d 82, 87 (Mo.App.1994)). "A fiduciary is defined as: 'A person having duty, ***created by his own undertaking,*** to act primarily for another's benefit in matters connected with such an undertaking." *Id.* (quoting Black's Law Dictionary 625 (6th ed.1990)).

[¶ 26] Under our case law, the express reposing of trust and confidence by one party is not enough to create a fiduciary

type duty. The duty arises from the conduct of the purported fiduciary. "Thus, '[t]he duty of honest advice and full disclosure arises where one party reposes confidence in the integrity of another and the other party in advising voluntarily assumes and accepts the confidence.'" *Rood v. Newberg*, 48 Mass. App.Ct. 185, 718 N.E.2d 886, 893 (1999) (quoting *Reed v. A.E. Little Co.*, 256 Mass. 442, 152 N.E. 918 (1926)). Lee alleged no facts to show that SBA had voluntarily assumed such a duty. Trust alone does not convert an ordinary arm's length transaction into a fiduciary or other similar relationship of trust and confidence.

[¶ 27] Our case law further indicates that we have been reluctant to impose additional duties and liability on lenders in a creditor/debtor relationship. *Martinez*, 891 P.2d at 788. We have said that the relationship between a lender and its customer is contractual in nature so we impose no duties higher than the morals of the marketplace. *Id.* Just as creditor/debtor relationships arise out of contract, so too do secondary obligations. A guaranty creates nothing more than a contract to pay the debt of another. *Taggart v. Ford Motor Credit Co.*, 462 N.W.2d 493, 500 (S.D.1990). It is essentially a contingent debtor-creditor relationship. A guaranty is a contract in which the guarantor has agreed to pay the creditor any amount not paid by the primary borrower. *United States v. Newton Livestock Auction Market, Inc.*, 336 F.2d 673, 677 (10th Cir.1964). In our past case law, we have been rightfully hesitant to find tort causes of actions where a contract exists. *Hulse*, 33 P.3d at 136 (when parties' difficulties arise directly from a contractual relationship, the resulting litigation concerning those difficulties is one in contract). We continue to be so hesitant today.

[¶ 28] Furthermore, when determining whether the second type of fiduciary relationship exists, we are to consider the relationship of the parties to each other and to the transaction. *Martinez*, 891 P.2d at

---

**8.** The phrases fiduciary relations and confidential relations are ordinarily used as convertible terms. *Peoples Bank and Trust Co. v. Lala*, 392 N.W.2d 179, 185 (Iowa App.1986) (quoting *First Nat'l Bank in Sioux City v. Curran*, 206 N.W.2d 317, 321 (Iowa 1973)); *see also State ex rel. Shriver v. Ellis*, 49 Ohio Law Abs. 161, 75 N.E.2d 704, 710 (App.1946) ("confidential and fiduciary relations are, in law, synonymous").

789. The second type of fiduciary relationship exists when one party has gained the confidence of the other and purports to act or advise with the other's interests in mind. *Doe v. Hartz,* 52 F.Supp.2d 1027, 1058–59 (Iowa 1999). We see no allegation that the bank ever purported to act for or advise with Lee's interests in mind. Instead, we are simply presented with a guarantor/creditor relationship. This relationship is inherently antagonistic. The bank obviously wants a guaranty because it feels that the debtor's assets alone will not support the loan. The creditor is requiring a guarantor to protect the creditor from loss, not the guarantor. In that respect the creditor has not voluntarily assumed any responsibility to protect the guarantor.

[¶ 29] Additionally, Lee's relationship to CDC/SBA was simply a result of her son's loan application. Lee had no prior relationship with the creditor. Generally, a confidential relationship must exist prior to, and apart from, the agreement that made the basis of the suit. *See Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 177 (Tex. 1997). Lee's significant relationship in this transaction was with her son. Lee did not guarantee the loan as a favor to the bank; she did it as a favor to her son so that he could obtain a loan. Considering all these factors, we do not find a fiduciary or other similar relation of trust and confidence.

[¶ 30] Certainly a lender could incur additional duties by conduct that creates a special or fiduciary relationship. The party alleging such a relationship is responsible for providing facts from which the relationship may arise. As we have said "[e]xtra-contractual lender duties, if there are any, must necessarily be predicated upon demonstration of a special or fiduciary relationship." *Martinez,* at 789 (citing John M. Burman, *Lender Liability in Wyoming,* 26 Land & Water L.Rev. 707, 712–713, 718 & 730 (1991)). The pleadings here simply did not contain such facts.

[¶ 31] Next, upon our review, we find no duty to disclose under subsection (e). Under this subsection the duty arises if one party "knows that the other is about to enter into [the transaction] under a mistake as to

[facts basic to the transaction]." Lee has failed to allege a single fact to show that SBA/Frontier CDC had knowledge that she was operating under a mistake. Under this subsection Frontier CDC/SBA must have had some knowledge that Lee was operating under a mistake. Lee simply asserts that she was unaware of all the facts. In the Supplemental Affidavit of Diane Johnston, President of Frontier CDC, Johnston stated that Lee had full access to all documents contained within the loan file, and if she had asked to review any documents, Frontier CDC would have made them available to her.

[¶ 32] The creditor should be able to rely on the debtor and his relationship to the guarantor to assure that the guarantor has been properly informed—especially in this situation where the debtor and the guarantor are in a familial relationship, which is widely known to be a fiduciary or confidential relationship. "[T]he creditor is entitled to assume that the surety is aware of all material facts ... particularly in cases where the surety assumes the risk at the debtor's request rather than at the creditor's request." *Magna Bank of Madison County v. Jameson,* 237 Ill.App.3d 614, 178 Ill.Dec. 285, 604 N.E.2d 541, 545 (1992). It is reasonable for a creditor to believe that the guarantor herself would ascertain whatever information she determines is important. After all, it is the guarantor that must assess the risk that the debtor will not pay when deciding whether to provide a guaranty. Because no facts were alleged that the creditor knew of a mistake, we would not find a duty under this subsection. Lee has a duty as a contracting party to inquire into the facts of the transaction. *See Commercial Nat'l Bank v. Audubon Meadow Partnership,* 566 So.2d 1136 (La.App.1990).

[¶ 33] Having found that no duty of disclosure will arise under § 551, we decline the invitation to adopt § 551 at this time. However, as noted by this court previously, a majority of jurisdictions have either accepted § 551 or cited it with approval. *Richey,* 904 P.2d at 802–03 and n. 3 (collecting cases). We are not suggesting that we reject § 551 and refuse to adopt it. However, because

§ 551 affects legal duties, we would prefer to fully consider its adoption when the parties have presented thorough argument on the subject and a duty of disclosure would actually exist under the restatement.

[¶ 34] We affirm the summary judgment granted to LPP on the causes of action for fraud, mistake, misrepresentation, and illegality.

### Debt Discharge

[¶ 35] Lee claims that the basis of the underlying debt was a single loan of $342,000.00, which consisted of $190,000.00 from Key Bank and $152,000.00 from Frontier CDC/SBA. She argues that there was only one $342,000.00 loan made as consideration for the guaranty and that this loan was discharged by acceptance and recordation of the deeds in lieu of foreclosure. She contends the terms of the deeds were unambiguous, in that acceptance and recording of the deeds "shall constitute full satisfaction and release of the debt of the Grantors to Grantee, as evidenced by a Commercial Revolving or Draw Note in the principal amount of $342,000.00, dated June 9, 1995, and secured by Grantee's Mortgage on the property described in this Deed."

[¶ 36] According to the Lee, however, on June 9, 1995, Key Bank had extended a bridge loan to Doug and Shirley in the amount of $342,000.00 so they would have temporary financing to purchase the car wash while the processing and approval of the SBA loan was being completed. Permanent financing from the SBA (through Frontier CDC) became available on September 7, 1995. The permanent financing involved the extension of a $159,000.00 SBA loan with a second mortgage on the car wash in the same amount. With the bridge loan, Doug and Shirley were able to purchase the car wash in June rather than September 1995. The SBA loan proceeds of $152,000.00 received in September were then applied to the Key Bank bridge loan, reducing it from $342,000.00 to $190,000.00. A Modification of Mortgage was signed by Doug and Shirley on September 7, 1995. The modification states:

This constitutes an amendment to said Mortgage to show that the above-referenced Mortgage is intended to secure the amount of One Hundred Ninety Thousand Dollars ($190,000), effective as of the date of receipt by Key Bank of Wyoming— Lander of the One Hundred Fifty–Two Thousand Dollars ($152,000.00) loan proceeds, which is evidenced by the second mortgage on the above-referenced property, which mortgage is dated September 7, 1995.

A condition required by Frontier CDC/SBA for extending the permanent loan was that Lee sign a guaranty in the amount of $159,000.00, which she executed on September 17, 1995.

[¶ 37] To the extent that we must construe the agreement between the parties, our primary focus is in determining whether the language is clear and unambiguous. *Pasenelli v. Pasenelli,* 2002 WY 159, ¶ 12, 57 P.3d 324, ¶ 12 (Wyo.2002). The question of whether an ambiguity exists is one of law for the court. *Hayes v. American Nat'l Bank of Powell,* 784 P.2d 599, 604 (Wyo.1989).

[¶ 38] Lee maintains that when Doug and Shirley deeded the car wash to Community First, and Frontier CDC released its second mortgage, the entire underlying loan was released, discharging her guaranty obligation. The guaranty, however, allowed the lender to release the security or collateral:

The Undersigned hereby grants to Lender full power, in its uncontrolled discretion and without notice to the undersigned, ... to deal in any manner with the Liabilities and the collateral, including, but without limiting the generality of the foregoing, the following powers:

\* \* \*

(d) to consent to the substitution, exchange, or release of all or any part of the collateral, whether or not the collateral, if any, received by Lender upon any such substitution, exchange, or release shall be of the same or of a different character or value than the collateral surrendered by Lender.

In addition, in 1999, Lee acknowledged and consented to the Lender Agreement between Community First and Frontier CDC, the clear intent of which was to release Frontier CDC's second mortgage for the sole purpose of facilitating sale of the premises, with no effect upon the Frontier CDC loan or the guaranty. And finally, the deed in lieu of foreclosure provided that "acceptance and recording of this Deed *shall constitute full satisfaction and release of the debt of the Grantors to Grantee, as evidenced by a Commercial Revolving or Draw Note in the principal amount of $342,000, dated June 9, 1995 . . . .*" (Emphasis added.) This language unambiguously satisfies the debt only of the grantee, Community First, as that debt is evidenced by the identified promissory note. It does not purport to release the debt of Frontier CDC. LPP was entitled to summary judgment on the discharge issue.

### Admissible Evidence

[¶ 39] Lee's final argument is LPP had an affirmative obligation to show by admissible evidence the absence of any issues of material fact and that it was entitled to judgment as a matter of law. Lee cites to W.R.C.P 56(e), which requires that affidavits must be made on personal knowledge and must set forth facts as would be admissible in evidence, showing affirmatively that the affiant is competent to testify to the matters stated in the affidavit. She argues that LPP's supporting affidavit was comprised of hearsay, was conclusory, was without personal knowledge, was without foundation, and did not explain even the most basic facts, such as the amount of the debt.

[¶ 40] However, there simply is nothing in the supporting materials to substantiate Lee's claims of fraud, illegality, and mistake. This lack of supporting material creates in itself an absence of issues of material fact. We therefore conclude that the trial court was correct in granting summary judgment to LPP and denying Lee's motion for summary judgment.

### CONCLUSION

[¶ 41] When viewed in the light most favorable to Lee, the evidence reveals no genuine issues of material fact as to fraud, illegality, or mistake. Nor are there genuine issues of material fact as to the discharge of the underlying debt. We, therefore, affirm the summary judgment.